**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**CIVIL ACTION NO.**

| | |
|---|---|
| LAWRENCE E. MARTIN, on behalf of himself and all other similarly situated, | ) ) ) |
| | ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| BRIGHTHOUSE LIFE INSURANCE COMPANY and BRIGHTHOUSE LIFE INSURANCE COMPANY OF NEW YORK, | ) ) ) ) ) |
| | ) |
| Defendants. | ) ) |

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Lawrence E. Martin ("Plaintiff" or "Martin"), on behalf of himself and all others similarly situated, for his Complaint against Defendants Brighthouse Life Insurance Company and Brighthouse Life Insurance Company of New York (collectively "Brighthouse" or "Defendants"), alleges as follows based upon his personal knowledge as to his own acts and upon information and belief as to all others:

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of Plaintiff and similarly situated owners of universal life ("UL") insurance policies issued and/or administered by Defendants. The claims of the Plaintiff and the proposed Class are based on the language of their UL policies, the terms of which are substantially similar for all UL policies and not subject to individual negotiation. Plaintiff seeks to represent policy owners who have been forced to pay inflated cost of insurance charges ("COI") by Defendants for UL coverage, in breach of express contractual provisions.

2.      UL policies are life insurance policies that combine death benefits with a savings or investment component -- this savings/investment component is known as the policy's "Cash Value." The Cash Value consists of money held in trust by Defendants for Plaintiff and the Class, and represents amounts contributed by the owner of the policy to his or her account in excess of the COI, plus any interest accrued on the Cash Value balance, minus administrative and other expenses.

3.      Defendants deduct the COI charge monthly from the policy owner's Cash Value, so the policy owner forfeits the COI charge to Defendants. The COI charge represents Defendants' risk -- the chance that Defendants will have to pay the death benefit (the policy's "coverage amount") to the policy's beneficiary when the insured dies. The payment of COI charges to cover Defendants' risk is the policy's insurance component, and Defendants contractually agreed to base their COI rate only on future outlook for mortality experience and expenses. Defendants calculate the COI charge by multiplying the applicable COI by the net amount at risk.

4.      The Plaintiff, along with numerous other UL policy owners, was, and continues to be, forced to pay inflated COI charges that are contrary to the plain language of their UL policies. The relevant policies promise that "[t]he cost of insurance rates are shown in the COST OF INSURANCE TABLE. We may use rates less than those shown. We *will* base these rates *only* on our future outlook for mortality and expenses." (emphasis added).

5.      These policy provisions created a mutual and reciprocal commitment between Defendants and all putative Class members: owners of UL policies agreed to let Defendants increase COI rates if expectations of future outlook on mortality and expenses worsens, and in return, Defendants agreed to decrease COI rates on its customers when there was an improvement

in future outlook on mortality experience and/or expenses. Defendants, however, have breached their express promise.

6.      Life expectancy has consistently and materially increased over the last three decades.[1] Mortality rates have improved over time with advances in medicine and better collective lifestyle habits. People who have retired recently are expected to live longer than those who retired in previous generations.[2] Defendant's expectations of future mortality experience have therefore substantially changed in its favor. Longer life expectancy decreases a life insurer's risks and increase a life insurer's profitability. A decline in mortality rates means that fewer insureds are dying in a given time frame, and, therefore, insurers make fewer payouts during that time frame. Older morality tables predict that people will die at a faster rate than current mortality tables.

7.      Upon information and belief, Defendants have relied upon outdated mortality assumptions/forecasts and have not lowered the COI rate assessed to persons insured under their UL policies.

8.      Plaintiff and the other class members had no choice in paying the inflated COI: Defendants appropriated it automatically every month as a "monthly deduction" comprised of the COI plus monthly expense charges from the Cash Value of the policy. Of these deductions the COI is by far the larger. This monthly deduction lowered the Cash Value of the policy.

9.      The component of what a COI rate can be "based on" is the most important feature of UL policies. The COI charge is by far the highest expense that a UL policy owner pays.

10.     The subject policies promise that, as to cost of insurance rates, "we will base these rates only on our future outlook for mortality and expenses." Defendants further promise that they

---

[1] *See e.g.* https://www.cdc.gov/nchs/data/hus/2017/015.pdf and https://www.macrotrends.net/countries/USA/united-states/life-expectancy (visited 3/9/21).

[2] *See e.g.* https://www.cdc.gov/nchs/products/databriefs/db355.htm (visited 3/9/21).

will re-assess the cost of insurance at least once every five years, but no more than once a year. This was a material provision in the contract. This provision requires Defendants to decrease COI rates if future outlook for mortality improved. If the situation had been reversed, so that future outlook for mortality had been worse for Defendants than originally anticipated, then (and only then) Defendants would have been contractually entitled to increase their COI rates. In the face of the substantially improved future mortality experience that has benefited Defendants, Defendants have not decreased COI rates in the face of decades of improved mortality experience, which would have been reflected in any future outlook undertaken in good faith at least once every five years as Defendants were required to do. This construction by Defendants is a continuing breach and continuing violation of the terms of the UL policies, and is implemented every month in the form of automatic inflated deductions from the insured's Cash Value.

11.     The UL policies issued and/or administered by Defendants are on various standard policy forms drafted and used by Defendants from time to time; the material terms of the UL policies were substantially similar in all material respects both with each other and all other UL policies that Defendants administer and/or issued to the Class. Upon information and belief, none of the UL policies has received COI rate decrease since issuance commensurate with steadily improved life expectancy.

12.     The overcharges by Defendants reduce a UL policy's Cash Value: money that would otherwise continue to belong to the policy owner, and that would grow by payments of guaranteed interest paid by Defendants pursuant to the policy, is taken improperly by Defendants for their own benefit and use. As the Cash Value is reduced, the policy owner has less funds to use to pay future COI charges, invest, borrow, and ultimately withdraw as cash. As a result of this misconduct, Plaintiff seeks monetary relief for the COI overcharges that Defendants have wrongly

imposed on its customers that purchased UL policies, plus the negative compounding from the foregone interest on the Cash Value.

## **THE PARTIES**

13.     Plaintiff Lawrence E. Martin is an individual who purchased the Universal Life policy at issue in this case while he was an employee of utilities provider Con Edison in New York. He resided in Kew Gardens, New York, at the time he purchased the policy from the Wheeler-Blackman Agency, Inc, located in New York, New York, at the time the policy was issued in 1984 Since 1998 Plaintiff Martin has resided in the State of Florida. Plaintiff Martin is the owner of the following UL insurance policy:[3]

| Policy No. | Death Benefit | Effective Date |
|---|---|---|
| XXXXXXXX [redacted] | $100,000 | 09/04/1984 |

14.     Plaintiff Martin's policy was originally issued by The Travelers Insurance Company, which changed its name to MetLife Insurance Company of Connecticut effective January 1, 2004. MetLife Insurance Company of Connecticut changed its name to MetLife Insurance Company USA effective November 14, 2014. MetLife Insurance Company USA changed its name to Brighthouse Life Insurance Company effective March 6, 2017. According to documents provided by Brighthouse Life Insurance Company of New York to Plaintiff, Brighthouse Life Insurance Company of New York administers the policy along with Brighthouse Life Insurance Company (the current policy issuer).

---

[3] A copy of the policy in Plaintiff's possession, in its current condition, is attached as Exhibit A and has been redacted to protect certain personal identifiers in accordance with this District's Notice Regarding Privacy and Public Access to Electronic Civil and Criminal Case Files.

15.     Plaintiff has paid all of the cost of insurance charges since November 1984. The Plaintiff has dutifully paid for the policy every month in the form of the Monthly Deduction made by Defendant, and by paying monthly premiums.

16.     Defendant Brighthouse Life Insurance Company is a corporation organized and existing under the laws of Delaware, having its principal place of business at 11225 North Community House Road, Charlotte, North Carolina 28277 according to its registration information on file with the National Association of Insurance Commissioners.[4]

17.     Defendant Brighthouse Life Insurance Company of New York is a corporation organized and existing under the laws of New York, having its principal place of business at 200 Park Avenue, New York, New York 10166, according to its registration information on file with the New York State Department of Financial Services.[5]

18.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of a common course of conduct and have acted in concert in furtherance of the improper acts, plans, schemes, and transactions that are the subject of this Complaint.  In addition, each of the Defendants rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, and was aware of his, her or its overall contribution to and furtherance of the wrongdoing.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action with diversity of citizenship between at least one class

---

[4] https://sbs.naic.org/solar-external-lookup/lookup/company/summary/119502347?jurisdiction=NC (visited 3/10/21).
[5] https://myportal.dfs.ny.gov/web/guest-applications/ins.-company-search.

member and one Defendant and the aggregate amount of damages exceeds $5,000,000, exclusive of interests and costs. Upon information and belief, less than two-thirds of the members of the proposed Class in the aggregate are citizens of the State of New York. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

20.     This Court has personal jurisdiction over Defendants because at least one of the Defendants are registered to do business in New York with the New York State Department of Financial Services, and both Defendants have sold policies to and collected premiums on UL policies from New York citizens (including Plaintiff) and sell UL policies through insurance brokers located in New York. Upon information and belief, Defendants are the current issuers of many policies covered by this action in New York that were sold to employees of Con Edison, which is located in New York, and to other New York citizens.

21.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because a substantial part of the events giving rise to Plaintiff's causes of action occurred in this District, including Defendants' COI rate overcharge, and because one of the Defendants is headquartered in this District and resides in this District.

## FACTUAL BACKGROUND

### B.     The Defendant's UL Program

22.     A UL policy is a type of permanent life insurance that features a savings component.  After initially funding the policy, insureds may choose to make additional payments to the cash value of a policy out of which COI and other charges are debited and to which interest is added by the insurer. Every month, COI and administrative charges are deducted from the Accumulated Cash Value, and the insurer credits the account with a guaranteed rate of interest.

Plaintiff's guaranteed annual interest rate is 4.5% credited daily to the Accumulated Cash Value of the policy.

23.     The policy owner can withdraw from the Accumulated Cash Value at any time – at any age – generally without tax penalties. A policy owner may also choose to leave the cash in the policy and allow the cash value to grow, or to pay COI charges. Defendants bill for premium payments in excess of the COI such that the excess premium amount accumulates in the Cash Value portion of the policy. The Defendants' UL policies provide a death benefit plus the Accumulated Cash Value (collectively, the "Death Benefit").

24.     Any amount deposited by the insured is credited to the Accumulated Cash Value. Interest payments are similarly credited to the Accumulated Cash Value. Accordingly, the Accumulated Cash Value is property that belongs to the insured.

25.     Pursuant to the Policy, and consistent with the fact that the Accumulated Cash Value is property that belongs to the insured (Plaintiff), the insured can make withdrawals from the Accumulated Cash Value.  *See* Ex. A at pg. 4C.  Pursuant to the Policy, the "maximum loan available will be the Loan Value on the date of the loan." The Loan Value is equal to the Cash Value less any applicable Surrender Penalty and any Handling Charge. *Id*. at pg. 4B.

26.     Further evidencing that the Cash Value is property that belongs to the insured, the policy provides that the Cash Value can be used as collateral for a loan from Defendant to the insured. *See id*. at pg. 4C ("We will, if you assign this contract to us while it is in effect, make a loan to you with this contract as security.")

27.     Defendants sell UL policies directly to consumers, and also to employees of various companies as part of group universal life policies (GUL policies) offered by employers. Defendants have issued multiple GUL policies for employees of large companies, such as Con

Edison. Each policy has a unique number. When an employee elects to participate in his or her employer's UL policy, Defendants issue that individual a universal life policy contract with a unique number. The contract includes all material terms of coverage and is the document that the employee receives providing the agreed upon terms and conditions of coverage.

28.     Plaintiff is informed and believes, and based thereon alleges, that with respect to the GUL policies provided by Defendants:

(a)     the employer makes no monetary contribution to the policy premiums; instead, each owner/employee is responsible for paying his or her own COI;

(b)     employee participation in the GUL policy is completely voluntary;

(c)     with respect to the GUL policy, the employer's sole functions are to permit the insurer to publicize the policy to employees, facilitate the collection of premiums— typically through automated payroll deductions -- and remit them to the Defendant; and

(d)     the employer receives no consideration in connection with the GUL policy.

29.     Plaintiff is informed and believes, and based thereon alleges, that with respect to the GUL policies, other than identifying which employees are eligible to apply for GUL coverage and setting the face amounts per class of insureds, no employer negotiated the material terms and conditions of coverage of the policies. Specifically, no employer negotiated any terms related to COI or the calculation thereof. Defendants provided the material terms and conditions of coverage on a "take it or leave it" basis to employers.

30.     The employer does not determine which employees meet Defendants' insurability requirements, nor does the employer administer claims made under the GUL policy. Other than identifying the voluntary GUL policy to their employees, the employers play no role in the sale, administration or claims handling of the GUL policies.

31.     For purposes of this action, GUL policies are no different than UL policies.

**C.    The Cost of Insurance Calculation**

32.     Each of Defendants' policies contain the following language, which is present in Plaintiff's policy, about how the rate used to calculate the COI charge will be determined and later reviewed:

> The cost of insurance rates are shown in the COST OF INSURANCE TABLE. We may use rates less than those shown. We will base these rates <u>only</u> on our future outlook for mortality and expenses. We <u>will</u> determine any change in the cost of insurance rates:
>
> 1.  not more often than once in any contract year; but
>
> 2.  at least once in every five contract years.
>
> Nothing in this contract will be affected by our actual mortality and expense experience. We will determine the rates at the start of each contract year and will assure them for the next contract year. Any change we make in the rates will be:
>
> 1.  on a uniform basis for Insureds of the same age, sex, duration, and rate class; and
>
> 2.  in accordance with the procedures and standards on file with the Insurance
>
>     Department of the state in which this contract is issued for delivery.

*Id.* at pg. 4B (emphasis added).

33.     The importance of the COI is highlighted by the following paragraph in the policies, which show that the COI is the primary input by which the Deduction Amount is calculated:

> Deduction Amount – The Deduction Amount is a monthly charge made against the Cash Value. It is equal to:
>
> 1.    the cost of insurance; plus
> 2.    the cost of additional benefits, as shown on the CONTRACT SUMMARY, and for which a separate charge is made; plus
> 3.    the expense charges shown on the CONTRACT SUMMARY.

*Id.* at pg. 4A.

34.     Each of Defendants' UL policies contain this language, or language that is substantially similar. These policies are referred to as "Class Policies."

35.     The relevant terms of all Class Policies are substantively identical to those set forth in the policy attached as Exhibit A, which is the policy owned by Plaintiff. The policies at issue are all form policies, and insureds are not permitted to negotiate different terms. The Class Policies are all contracts of adhesion.

36.     The Cost of Insurance Rates provision obligates Defendants to base COI rates "only on our future outlook for mortality and expense." Nothing else. Because the COI rates on the Class Policies must be based primarily on expectations of future mortality experience and expenses are not material to the COI charge based on a review of annual statements from Defendants (representing that expenses are $0.00), COI rates must be adjusted downward when mortality experiences are improving.

37.     The size of the COI charge is critical to UL policy owners for at least two important reasons: (a) the COI charge is the highest expense that a policy owner pays; and (b) the COI charge is deducted from the Accumulated Cash Value (i.e., the savings component) of the policy, so the policy owner forfeits the COI charge entirely to Defendants.

38.     Defendants have taken, or forced policy owners to pay, excess COI charges by not decreasing COI in the face of improving mortality. Plaintiff's COI has increased steadily. Had Defendants lowered the COI consistently with improved mortality as they were contractually obligated to do, Plaintiff would have paid less COI. By way of example, Plaintiff paid the following inflated COI from 2014-2019:

(a)     In 2014, Defendants increased the COI charge assessed to Mr. Martin's policy to $2,453.05.

(b)      In 2015, Defendants increased the COI charge assessed to Mr. Martin's policy to $2,668.01.

(c)      In 2016, Defendants increased the COI charge assessed to Mr. Martin's policy to $2,884.35.

(d)      In 2017, Defendants increased the COI charge assessed to Mr. Martin's policy to $3,157.71.

(e)      In 2018 Defendants increased the COI charge assessed against Mr. Martin's policy to $3,885.01.

(f)      In 2019, Defendants increased the COI charge assessed against Mr. Martin's policy to $4,321.68.

39.      Defendants' inflated COI deductions from the Accumulated Cash Value of Plaintiff's UL policy were so substantial, as detailed further below, that they caused Brighthouse to notify Plaintiff Martin in 2020 that his planned annual premium would have to be increased materially -- from $200 to almost $700 per month -- to avoid the policy lapsing due to insufficient funds. In other words, without a substantial increase in planned premiums, Plaintiff's policy would be terminated because the Cash Value and current planned premiums would be insufficient to cover the COI.

### D.      Improving Mortality and Defendants' Unlawful Failure to Base COI Rates Solely on Expectations of Future Mortality

40.      Defendants have not decreased, their COI rates for Class Policies, despite the fact that mortality rates have improved steadily — i.e., mortality risks have only gotten *better* over time because people are living much longer than anticipated when the products were priced and issued. Accordingly, the cost of life insurance tied to forecasts of mortality, as the UL policies at issue here expressly provide for, has declined.

41.     A mortality table (sometimes called life expectancy table) is a chart showing the rate of death at a certain age. Rate of death can be measured as a percentage or in terms of the number of deaths per thousand. Separate tables are produced to reflect populations with different mortality. Mortality tables will usually have separate tables for gender. Mortality tables for use with individual life insurance policies additionally distinguish mortality rates for tobacco-use status, underwriting status, and duration since underwriting. Mortality tables are used by actuaries to calculate insurance rates and are designed to reflect mortality rate experience.

42.     Beginning at least as early as 1980, the National Association of Insurance Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry standard mortality tables that are commonly used by insurers, including Defendants, to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies.

43.     The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 CSO Mortality Table"). That table was the industry-standard table until 2001. In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced a proposal for a new CSO mortality table. The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table and (b) mortality rates had improved significantly each year since the 1980 table issued. The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted . . . .

[C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.[6]

44.     The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table." This means the tables are showing a substantial improvement in mortality in a 20-year time period. These mortality improvements represent a substantial benefit that Defendants were obligated to have passed on to policy owners pursuant to express provisions of the insurance contract. The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table"). The 2001 CSO Mortality Table reflected vastly improved mortality experience as compared to the 1980 CSO Mortality Table.

45.     The 2001 CSO Mortality Table was generated from the 1990-95 Basic Mortality Tables published by the SOA. The SOA performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. Periodically the SOA will publish an updated table to reflect the evolving industry experience. Major updates they have published over the last few decades include:

- 1975-80 Basic Select and Ultimate Mortality Table
- 1985-90 Basic Select and Ultimate Mortality Tables
- 1990-95 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table
- 2008 Valuation Basic Table
- 2015 Valuation Basic Table
- 2017 Valuation Basic Table

---

[6] *See* Report of the American Academy of Actuaries' Commissioner's Standard Ordinary (CSO) Task Force, Presented to the National Association of Insurance Commissioners' Life and Health Actuarial Task Force (LHATF), June 2001, *available* at http://www.actuary.org/pdf/life/cso2 june01.pdf. (visited 3/15/21).

46.     The 1990-95 Basic Table reflected the death rates observed by 21 large life insurance companies with policy anniversaries between 1990 and 1995. This experience study is for data at, around, or immediately prior to the publication of the policy forms which are the subject of this complaint. The 2001, 2008 and 2015 Valuation Basic tables each show significant mortality improvements from the 1990-1995 Basic tables demonstrating that since the introduction of the 2001 CSO Mortality Table, mortality experience has continued to improve substantially and consistently.

47.     The Executive Summary to the Report on the 2017 CSO and 2017 CSO Preferred Structure Table Development, issued jointly by the SOA and the Academy in 2015, stated as follows about improvements in mortality:

> The current CSO table was created in 2001 based on experience from 1990-1995 and thus, is at least 20 years old. Since that time industry experience studies performed by the Society of Actuaries Individual Life Experience Committee (ILEC) have shown significant improvement in the mortality rates experienced by the industry from that underlying the 2001 CSO table development.[7]

48.     Upon information and belief, Defendants use the industry standard mortality tables to gauge mortality, and their future outlook for mortality, for their UL business.

49.     In any event, regardless of whether Defendants use the industry standard mortality tables, it is indisputable that life expectancy has increased steadily since 1984, the year Plaintiff bought his policy.[8]  Insureds across all ages are living longer today than in 1984, which has been a windfall for insurers like Defendants who have had to pay on fewer on policies as a result. Accordingly, "any future outlook [of] mortality" made in good faith would have steadily improved since 1984.

---

[7] https://www.soa.org/globalassets/assets/Files/Research/Exp-Study/research-2017-cso-report.pdf (visited 3/12/21).

[8] https://www.cdc.gov/nchs/data/hus/2017/015.pdf (visited 3/9/2021).

50.      Despite this trend of improving rates of mortality since the inception of Plaintiff's policy in 1984, Defendants have not decreased the COI rates on Class Policies commensurate with such improved mortality. Indeed, in a 2017 flyer about UL policies, Defendants admitted that COI rates have not been adjusted since 2001:

> Has Brighthouse Financial changed COI rates on UL policies in the past?
>
> For most of our contracts, we have the flexibility to change current COI rates at any time. Actual death claim experience is regularly monitored to ensure it is consistent with pricing assumptions.
>
> Between 1991 and 2001, Brighthouse Financial changed the current COI rates on a portion of UL policies, with some rates increasing and some decreasing. While Brighthouse Financial could change COI rates in the future, there have been no changes since 2001.[9]

51.      Plaintiff does not know, and cannot know without discovery, whether Defendants increased, decreased, or left unchanged, the COI on the Class Policies between 1991 and 2001, or between 1984 and 1991, but Brighthouse's admitted failure to decrease rates since 2001 in the face of continued improvements in mortality amounts to a clear breach of Defendants' contracts with Plaintiff and the Class. According to data from the Center for Disease Control, longevity improved significantly from the 1980s across both sexes and all races (Plaintiff purchased his policy in 1984) to 2016:[10]

|  | At Birth | At 65 | At 75 |
|---|---|---|---|
| 1980 | 73.7 | 16.4 | 10.4 |
| 2001 | 77 (+4.4% from 1980) | 17.9 (+9.1% from 1980) | 11.2 (+7.7% from 1980) |
| 2016 | 78.6 (+2% from 2001) | 19.4 +(8.4% from 2001) | 12.2 (+9% from 2016) |

52.      By not decreasing the COI from (at least) 2001 to 2017, as they have admitted, Defendants have plainly and materially breached their contract with their insureds, causing them

---

[9]  https://www.brighthousefinancial.com/content/dam/brighthouse-financial/public/pdfs/paul/UL-FAQ-Flyer.pdf  (visited 3/12/2021).

[10] *See* https://www.cdc.gov/nchs/data/hus/2017/015.pdf (visited April 5, 2021).

significant financial damages in the form of decades' worth of inflated COI charges and negatively compounded interest.

**D**.     **The Devastating Impact of Defendants' Deduction of Inflated COI Charges**

53.     Deducting inflated and unauthorized COI from insureds' accounts deprives them of compounding benefits. Pursuant to the UL policies, the Accumulated Cash Value earns a guaranteed interest of 4.5%. Deductions from the Accumulated Cash Value do not simply deprive the insureds of the amounts deducted, it deprives them of the 4.5% that would otherwise have accrued. It leads to negative compounding that can devastate the Accumulated Cash Value and imperil the policy, requiring a cash injection from the insured either in lump sum or in the form of dramatically increased premiums.

54.     On October 16, 2020, Plaintiff received a letter from Defendants informing him that his "policy requires a $5,931.36 increase in [his] annualized planned premium or [his] policy may lapse due to insufficient funds." The new planned premium is $694.28. Up until now, Plaintiff's planned premium had been $200 per month. As of October 2020, Plaintiff had paid $52,449 in planned premiums on his $100,000 life insurance policy. After paying the planned premium that was asked of him for 36 years, in addition to the monthly COI deductions, Plaintiff is now facing a 347% increase in planned premiums or the loss of his policy on May 27, 2022, at which point his Accumulated Cash Value will be completely eaten up by the COI charges.

55.     Most, if not all, owners of the Class Policies have paid into the policies for decades and are long retired. They cannot afford a massive increase in planned premiums and face the loss of decades of premiums already paid into Defendants' UL policies.

## CLASS ACTION ALLEGATIONS

56.     This action is brought by plaintiff individually and on behalf of one class pursuant to Rules 23(b)(3) of the Federal Rules of Civil Procedure.

The class consists of:

All owners of "universal life" insurance policies (including group universal life policies) issued and/or currently administered by Brighthouse Life Insurance Company and/or Brighthouse Life Insurance Company of New York that contain the following language: "We will base these [cost of insurance] rates only on our future outlook for mortality and expenses." The Class does not include Defendant, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

57.     The Class consists of thousands of consumers of UL insurance and are thus so numerous that joinder of all members is impracticable. The identities and addresses of Class members can be readily ascertained from business records maintained by Defendant.

58.     The claims asserted by Plaintiff are typical of the claims of the Class.

59.     The Plaintiff will fairly and adequately protect the interests of the Class and does not have any interests antagonistic to those of the other members of the Class.

60.     Plaintiff has retained attorneys who are knowledgeable and experienced in universal life insurance litigation, as well as class and complex litigation.

61.     Plaintiff requests that the Court afford Class members with notice and the right to opt-out of any Class certified in this action.

62.     This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the Class predominate over any individualized issues. Those common questions that predominate include:

(a)     the construction and interpretation of the form group life insurance policies at issue in this litigation;

(b)     whether Defendants' actions in failing to decrease the cost of insurance charges imposed on the class violated the terms of those form group life insurance policies;

(c)     whether Defendants based its COI charges solely on its future outlook for mortality and expenses;

(d)      whether Defendants based its COI charges principally on its expected mortality experience;

(e)      whether Defendants breached its contracts with Plaintiff and members of the Class;

(f)      whether Defendants have experienced better mortality than it expected; and

(g)      whether Plaintiff and members of the Class are entitled to receive damages as a result of the unlawful conduct by Defendants alleged herein and the methodology for calculating those damages.

63.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)      the complexity of issues involved in this action and the expense of litigating the claims means that few, if any, Class members could afford to seek legal redress individually for the wrongs that Defendants committed against them, and absent Class members have no substantial interest in individually controlling the prosecution of individual actions;

(b)      when Defendants' liability has been adjudicated, claims of all Class Members can be determined by the Court;

(c)      this action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort, and expense, and ensure uniformity of decisions;

(d)      without a class action, many Class members would continue to suffer injury, and Defendants' violations of law will continue without redress while Defendants continue to reap and retain the substantial proceeds of its wrongful conduct; and

(e)    this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

64.    Plaintiff realleges and incorporates herein the allegations of Paragraphs 1 through 63 above of this Complaint as if fully set forth herein. This claim is brought on behalf of Plaintiff and the Class.

65.    The Class Policies are binding, written insurance contracts, made for consideration, and in effect since 1984.

66.    Defendants breached the contract by deducting COI charges calculated from COI rates not based on future outlook for mortality experience and expenses, resulting in deduction of inflated COI. These overcharges include, but are not limited to, the excess COI charges that Defendants deducted by not reducing COI rates based on improved mortality.

67.    Plaintiff and Class members have performed all of their obligations under the policies, except to the extent that their obligations have been excused by Defendants' conduct as set forth herein.

68.    As a direct and proximate cause of Defendants' material breaches of the policies, Plaintiff and the Class have been — and will continue to be — damaged as alleged herein in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### Breach of Covenant of Good Faith and Fair Dealing

69.    Plaintiff realleges and incorporates herein the allegations of Paragraphs 1 through 68 above as if fully set forth herein. This claim is brought on behalf of Plaintiff and the Class.

70.    The Class Policies constitute enforceable contracts under New York law.

71.     In New York, the implied covenant of good faith and fair dealing applies to most contracts, including the Class Policies.

72.     Defendants materially breached the covenant of good faith and fair dealing by violating Plaintiff's and Class Members' reasonable commercial expectation that Defendants would lower the Cost of Insurance if forecasts of mortality improve. Any good faith forecast of mortality since the 1980s would have to have improved because life expectancy has dramatically improved over that time period, as alleged above.

73.     Defendants have unfairly frustrated the agreed-upon purpose of the Class Policies by failing to decrease the Cost of Insurance rate even though mortality rates have vastly improved over the years.

74.     Plaintiff's and Class Members' reasonable expectation does not contravene the express terms of the Class Policies.

75.     As a direct and proximate result of Defendants' failure to decrease the Cost of Insurance rate in the face of improved mortality rates, Plaintiff and the Class have been harmed.

### THIRD CLAIM FOR RELIEF

### Unjust Enrichment

76.     Plaintiff realleges and incorporates herein the allegations of Paragraphs 1 through 75 above of this Complaint as if fully set forth herein. This claim is brought on behalf of Plaintiff and the Class.

77.     Plaintiff and the Class conferred a benefit on Defendants by making COI payments that were in excess of the amounts they should have been charged had the Defendants properly accounted for better mortality rates.

78.     Defendants have knowledge of this benefit and have voluntarily accepted and retained the benefit conferred on them.

79.     It would be inequitable to allow Defendants to retain such funds, and Plaintiff and each Class member is entitled to an amount equal to the amount each enriched Defendants and for which Defendants have been unjustly enriched.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.     Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.     Awarding Plaintiff and the Class compensatory damages;

3.     Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as attorney's fees and costs;

4.     Awarding Plaintiff and the Class an award against Defendants for the amounts equal to the amount Plaintiff and each Class Member enriched Defendants and for which Defendants have been unjustly enriched;

5.     Establishing a constructive trust over the funds improperly deducted as inflated COI charges from the Cash Value of Plaintiff and other class members;

6.     Awarding Plaintiff and the Class such other relief as this Court may deem just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and the Class hereby demand a trial by jury as to all issues so triable.

Dated: April 6, 2021

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**

*/s/ Andrei Rado*

Barry Weprin

Andrei Rado
Adam H. Cohen
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Telephone: (212) 594-5300
E-mail:    arado@milberg.com
           bweprin@milberg.com
           acohen@milberg.com